Robert A. Magnanini, Esq.
Michael A. Clore, Esq.
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalaw.com
mclore@stonemagnalaw.com

Christopher P. Lenzo, Esq.
LENZO & REIS, LLC
360 Mt. Kemble Ave., Suite 1004
Morristown, New Jersey 07960
Tel: (973) 845-9922
Fax: (973) 845-9933
clenzo@newjerseyemploymentattorneys.com

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW JERSEY, *ex rel.* [UNDER SEAL],<br><br>            Plaintiffs,<br><br>    v.<br><br>[UNDER SEAL],<br><br>            Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**DEMAND FOR JURY TRIAL** |

Robert A. Magnanini, Esq.
Michael A. Clore, Esq.
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalaw.com
mclore@stonemagnalaw.com

Christopher P. Lenzo, Esq.
LENZO & REIS, LLC
360 Mt. Kemble Ave., Suite 1004
Morristown, New Jersey 07960
Tel: (973) 845-9922
Fax: (973) 845-9933
clenzo@newjerseyemploymentattorneys.com

*Attorneys for Plaintiff-Relators*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW JERSEY, *ex rel.* BEN AALAMPOUR, <br><br>     Plaintiffs, <br><br>     v. <br><br> RAAB PHARMACY A/K/A ZOOBEEDU INC. D/B/A HOME TOWNE RX, RAAB PHARMACY INC. D/B/A RAAB PHARMACY, RAAB PHARMACY PASSAIC LLC D/B/A RAAB PHARMACY, CANARSIE CORP. D/B/A CANARSIE PLAZA PHARAMCY, JEMISHA INC. D/B/A NEW PARSONS PHARMACY, AQEEL SHEIKH, NIDHA AHMED, BADAR MANSOUR, ARIF KHAN, FAISAL MUSHTAQ,  JOHN DOES 1-10, and CORPORATIONS X, Y, Z, <br><br>     Defendants. | Civil Action No. <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** <br><br> **DEMAND FOR JURY TRIAL** |

On behalf of the United States of America and the State of New Jersey, Plaintiff-Relator Ben Aalampour ("Relator"), by and through his counsel files this *qui tam* Complaint against Defendants Aqeel Sheikh ("Sheikh"), Nidha Ahmed ("Ahmed"), Badar Mansour ("Mansour"), Arif Khan ("Khan"), Faisal Mushtaq ("Mushtaq"), Raab Pharmaceuticals a/k/a Zoobeedu Inc. d/b/a Home Towne Rx ("Home Towne Rx"), Raab Pharmacy Inc. d/b/a Raab Pharmacy ("Raab Pharmacy Linden"), Raab Pharmacy Passaic LLC d/b/a Raab Pharmacy ("Raab Pharmacy Passaic"), Canarsie Corp. d/b/a Canarsie Plaza Pharmacy ("Canarsie Plaza Pharmacy'), Jemisha Inc. d/b/a New Parsons Pharmacy ("New Parsons Pharmacy'), John Does 1-10, and Corporations X, Y, Z (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of New Jersey (together, the "Government") from Defendants for knowingly and/or recklessly presenting or causing to be presented false claims to the Government in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), the New Jersey False Claims Act ("NJFCA"), N.J.S.A. §§ 2A:32C-1, *et seq.*, the New Jersey Medical Assistance and Health Services Act ("NJMAHS"), N.J.S.A. § 30:4D-1, *et seq.*,  the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. §§ 34:19-1 to 19-8; and applicable professional and ethical guidance from the American Pharmacists Association and others.

2.      The illegal acts herein began in at least 2017 and continue through the present ("Covered Period").

3. Of immediate concern, the Defendants' fraudulent scheme threatens to cause a significant and negative impact on the public health of individuals currently prescribed medications for the treatment of HIV/AIDS.

4. Defendant Home Towne Rx specializes in pharmaceutical services, and Defendants Sheikh, Ahmed, Mansour, Khan and Mushtaq all possess either ownership, managerial, or employment interests at Home Towne Rx and other pharmacies and all participated in creating, structuring or executing the fraudulent scheme. Income for Defendants is highly dependent on reimbursement from various Government-funded healthcare programs at the federal and state level, including Medicaid and Medicare. Such programs are jointly referred to herein as "Government Programs."

5. Throughout the Covered Period, Defendants have knowingly submitted bills seeking payment from Government Programs for (1) the provision of prescription medications which were never prescribed by doctors, requested by customers, or dispensed to customers; and (2) the provision of improperly diverted, usually purchased on the streets, prescription HIV/AIDS drugs. As a result, the United States and the State of New Jersey have issued at least $1 million in unauthorized payments to Defendants during the Covered period.

6. Defendants intentionally and routinely engage in other improper activity, including: (1) forging customer signatures to falsely confirm that prescriptions were filled and picked up; (2) purchasing used HIV/AIDS medication on the streets for resale to customers rather than ordering them from a qualified wholesaler; and (3) removing labels from prescription bottles and replacing them with falsified labels for different customers.

7. Defendants have actual knowledge that they are engaging in illegal misconduct, including knowledge that their bills to Government Programs are not entitled to payment and that

improperly obtained payments must be refunded to the Government. Defendants know that prescription medications should be sourced from proper wholesalers as opposed to being diverted from customers for whom the prescriptions have been filled or purchased on the streets for resale; that prescription medication, once prescribed to one customer, cannot be recycled and provided to another customer; prescription labels cannot be removed from prescription bottles containing unused drugs and replaced with new prescription labels; prescriptions and their refills cannot be filled without a physician's order or customer request; and customer signatures on prescription pickup forms cannot be forged by pharmacy employees. Further, Defendants attempt to prevent Relator and other employees from informing law enforcement about their illegal practices by paying previous pharmacists in cash under the table or paying them with handwritten, personal checks which create potential tax liability for those employees as a method of obtaining cooperation or silence. Defendants have chosen to profit from fraudulently billing Government Programs instead of disclosing the true nature and extent of the prescriptions for which they fraudulently bill or returning improperly obtained public funds.

8.      Defendants have caused a total actual loss to the United States and the State of New Jersey in excess of $1 million during the Covered Period.

## PARTIES

9.      Plaintiff-Relator is an individual and citizen of the United States of America and the State of New Jersey, currently residing in New Brunswick, NJ He is a licensed pharmacist having graduated from the University of Buffalo in 1989 with a Bachelor of Science in Pharmacy. Since receiving his license, Relator has worked as a pharmacist for numerous companies including CVS and Merck, and even owned his own pharmacy, Jefferson Pharmacy, from 2005 to 2010. In 2008, Aalampour received the "Businessman of the Year" award from

Jefferson Township Chamber of Commerce in Lake Hopatcong after growing Jefferson Pharmacy from a location serving only three customers to having $4.5 million dollars in revenue in only five years.

10.     Relator began working full-time as a pharmacist for Defendants in August 2019, but was terminated on May 1, 2020 purportedly because Home Towne Rx was changing ownership. In that capacity, Relator gained direct and independent knowledge of the information on which the below allegations are based, and herein voluntarily discloses such information to the Government pursuant to 31 U.S.C. § 3730(e)(4)(B)(i). To the extent any of his allegations have been publicly disclosed as contemplated by 31 U.S.C. § 3730(e)(4)(A), Relator's knowledge is independent of and materially adds to those allegations as pursuant to 31 U.S.C. § 3730(e)(4)(B)(ii). Relator seeks to recover for the benefit of the United States and the State of New Jersey all appropriate damages, civil penalties, interest, costs, and fees arising from Defendants' violations of the FCA, NJFCA, NJMAHS, and CEPA.

11.     Defendant Raab Pharmacy a/k/a Zoobeedu Inc. d/b/a Home Towne Rx is a New Jersey corporation with its principal place of business located at 635 South Clinton Avenue, Trenton, New Jersey. It also has a mailing address at 100 Province Line Road, Skillman, New Jersey, and a contact number of (786) 299-4734, a South Florida area code. Home Towne Rx provides on-site pharmaceutical services including the filling and dispensing of prescription medications to customers.

12.     Defendant Raab Pharmacy Inc. d/b/a Raab Pharmacy is a New Jersey corporation with its principal place of business located at 222 North Wood Avenue, Linden, New Jersey. Raab Pharmacy Linden provides pharmaceutical services including the filling and dispensing of prescription medications to customers.

13.     Defendant Raab Pharmacy Passaic LLC d/b/a Raab Pharmacy is a limited liability company with its principal place of business located at 31 Lexington Avenue, Passaic New Jersey.  Raab Pharmacy Passaic provides pharmaceutical services including the filling and dispensing of prescription medications to customers.

14.     Defendant Canarsie Corp d/b/a Canarsie Plaza Pharmacy is a New York Corporation with its principal place of business located at 8721 Flatlands Avenue, Brooklyn, New York.  Canarsie Plaza Pharmacy provides pharmaceutical services including the filling and dispensing of prescription medications to customers.

15.     Defendant Jemisha Inc. d/b/a New Parsons Pharmacy is a New York Corporation with its principal place of business located at 88-01 Parsons Boulevard, Jamaica, New York. New Parsons Pharmacy provides pharmaceutical services including the filling and dispensing of prescription medications to customers.

16.     Defendant Aqeel Sheikh purchased Home Towne Rx in 2017 and retains an ownership interest in the corporation and its pharmacy services.  Sheikh also owns Raab Pharmacy Linden, Raab Pharmacy Passaic, Canarsie Plaza Pharmacy, and New Parsons Pharmacy.  Sheikh and his family also own Frank's Motor Cars with two locations, one in Elmwood Park, New Jersey and the other in Paterson, New Jersey.  In 2015, Sheikh, along with several co-conspirators, was charged with participating in a $3 million credit card fraud.  On December 10, 2019, he was sentenced to seven years in New Jersey State Prison for two counts of Money Laundering in the second degree.

17.     Defendant Nidha Ahmed is the daughter of Defendant Aqeel Sheikh and also has an ownership interest in Defendant Home Towne Rx.  As detailed below, she is currently tasked

with managing the operations at Home Towne Rx, including oversight of the billing for the filling of prescriptions to customers.

18.     Defendant Badar Mansour is a member of Defendant Aqeel Sheikh's extended family and is also employed by Home Towne Rx.  As detailed below, Mansour is tasked with diverting used HIV/AIDS medication from pharmacy customers or purchasing them on the streets to be recycled and used to fill other customers' prescriptions.

19.     Defendant Faisal Mushtaq is, upon information and belief, the son of Defendant Aqeel Sheikh and also an employee of Defendant Home Towne Rx.  As detailed below, Mushtaq replaced Mansour in completing the task of acquiring used HIV/AIDS medication from pharmacy customers or others to be recycled and used to fill other customers' prescriptions.

20.     Defendant Arif Khan is an employee of Defendant Home Towne Rx.  He is tasked with providing personnel and payroll services at Home Towne Rx.  Khan also works as an assistant to Defendant Ahmed.

21.     Defendants John Does 1-10, Corporations X, Y, Z, are named because Sheikh and other individual defendants have employed other unnamed individuals and business entities in the commission of their fraudulent scheme during the Covered Period.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over Relator's FCA, NJFCA, NJMAHS, and CEPA claims.  The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. § 3732, and otherwise have jurisdiction over federal statutory causes of action under 28 U.S.C. §§ 1331 and 1345.  This Court has jurisdiction over Relator's NJFCA, NJMAHS, CEPA, and common law claim pursuant to 28 U.S.C. § 1367.

23.     At all relevant times, Defendants conducted regular, substantial business in the State of New Jersey and maintained offices in at least Trenton, Passaic, and Linden, New Jersey. Accordingly, Defendants are properly subject to personal jurisdiction in New Jersey generally and this Court specifically.

24.     Venue is appropriate in the District of New Jersey pursuant to 31. U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(1) and (2).  Section 3732(a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred."  The acts complained of herein occurred throughout the State of New Jersey and within the geographic area encompassed by the United States District Court for the District of New Jersey.

25.     Under both the FCA and NJFCA, this Complaint is to be filed *in camera* and remain under seal until the Court orders otherwise.

## STATUTORY SCHEME

### Government-Funded Health Programs

26.     The Medicare Program is a federal government-funded medical assistance program, primarily benefiting the elderly, which was created in 1965 when Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (hereinafter, "Medicare"). Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"), and is funded by taxpayer revenue.  Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, and durable medical equipment to persons older than 65 years of age and others who qualify under its terms and conditions.  Payments

made under Medicare include payment for certain prescription medications used during treatment at an appropriate medical facility and otherwise. Pursuant to the Medicare Prescription Drug Improvement and Modernization Act of 2003, Medicare Part D took effect, extending prescription drug coverage to all Medicare-eligible persons who elect to participate.

27.    Significantly, Medicare reimbursement is prohibited if the item or service is not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

28.    The Medicaid Program was also created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the financially needy, aged, blind, or disabled, and families with dependent children. *See* 42 U.S.C. §§ 1396-96w; *see also* N.J.S.A. § 30:4D-1, *et seq.* (together, "Medicaid"). Medicaid is funded by both federal and state governments (collectively, "Medicaid Funds"), with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b, 1396d(b). Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially-needy individuals who qualify under its terms and conditions. At the federal level, Medicaid is administered by CMS. At the state level, each of the 50 participating states has a state agency to administer the program.

29.    Each state is permitted to design its own medical assistance plan, subject to CMS parameters and HHS approval. Among other forms of medical assistance, the states are permitted to provide medical assistance from the Medicaid Funds to eligible persons for inpatient and outpatient prescription drugs. 42 U.S.C. §§ 1396a(10)(A), 1396d(a)(12).

30.    The federal statute defers to each state's definition of "medical necessity" for purposes of Medicaid. In New Jersey, "medical necessity" is clearly a prerequisite for provision

of Medicaid services, but is a determination left to the physician's discretion: "Any service limitations imposed will be consistent with the medical necessity of the patient's condition as determined by the attending physician or other practitioner and in accordance with standards generally recognized by health professionals and promulgated through the New Jersey Medicaid program." N.J.A.C. § 10:49-5.1 (2016).

### The Federal False Claims Act

31.    The federal FCA imposes liability upon any person who: "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved." 31 U.S.C. § 3729(a)(1) & (2). Any person found to have violated these provisions is liable for a civil penalty of at least $11,181 and up to $22,363  for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government. *Id.*; *see also* Civil Monetary Penalties Inflation Adjustment, 81 Fed. Reg. 42491 (June 30, 2016) (to be codified at 28 C.F.R. 85).

32.    Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

33.    The FCA also broadly defines a "claim" as one that "includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

9

34.     False or fraudulent bills or other requests for payment or reimbursement from Government Programs have routinely been found to constitute "claims" giving rise to liability under the FCA.  *See, e.g., Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

35.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene and take over primary responsibility for prosecuting the action.

36.     The Supreme Court has stated that Congress intended that the FCA be broadly applied to protect government funds and property from fraudulent claims.  *See, e.g., United States v. Niefert-White Company,* 390 U.S. 228 (1968).

37.     The FCA contains anti-retaliation provisions which prohibit an employer from retaliating against an employee "because of lawful acts done by the employee . . .  in furtherance of an action under this section or other efforts to stop 1 or more violations." 31 U.S.C. § 3730(h)(1).  The relief available to an employee under this provision is two times the amount of back pay plus interest, reinstatement with the same seniority status, and compensation for any special damages, including litigation costs.  31 U.S.C. § 3730(h)(2).

### The New Jersey False Claims Act

38.     This action is also filed under the New Jersey False Claim Act, N.J.S.A.§§ 2A:32C-1, *et seq.*

39.     N.J.S.A. § 2A:32C-3 subjects to liability a person who:

(a)   Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval; [or]

(b)   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State[.]

40.    The NJFCA subjects such persons to liability to the State  of New Jersey for a civil penalty of not less than $11,181 and not more than $22,363  for each false or fraudulent claim, plus three times the amount of damages which the State sustains because of the act of such person.  N.J.S.A. § 2A:32C-5(b) allows a private person to bring a civil action in the name of the State of New Jersey for violation of the NJFCA.

**New Jersey Conscientious Employee Protection Act**

41.    CEPA,  the  New  Jersey  Conscientious  Employee  Protection  Act, N.J.S.A. §§ 34:19-1 to 19-8, provides for the protection of employees who would otherwise face adverse employment consequences for disclosing, objecting to, or refusing to participate in their employers' illegal misconduct.

42.    Under CEPA, it is unlawful for an employer to take "retaliatory action" against an employee for the employee's disclosure or provision of information to a "public body" regarding, objection to, or refusal to participate in any activity, policy, or practice by the employer that the employee reasonably believes "(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any … governmental entity …; [or] (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any … governmental entity".  N.J.S.A. § 34:19-3.

11

43.     "Retaliatory action" is defined as the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment. N.J.S.A. § 34:19-2(e).

44.     Under CEPA, a prevailing plaintiff can recover uncapped compensatory and punitive damages, as well as an award of attorneys' fees and costs. N.J.S.A. § 34:19-5.

## RELEVANT FACTS

### Background

45.     Most of the events at issue occurred at or near 635 South Clinton Avenue, Trenton, New Jersey, where Defendant Home Towne Rx is located.  Defendants Sheikh and Ahmed own the location.

46.     On August 5, 2019, Defendant Arif Khan informed Relator of a potential job opening for a head pharmacist at Home Towne Rx.  Relator had met Khan while working part-time at Raab Pharmacy Linden.  On August 7, 2019, Relator interviewed with Sheikh who offered him the position of full-time licensed pharmacist at Home Towne Rx.  On his first day working at Home Towne Rx, Relator was unnerved by a question posed by Home Towne Rx pharmaceutical technician, Erica Pagan, inquiring how long Relator would last at Home Towne Rx.  Relator asked Erica Pagan why the previous pharmacist had resigned, and she responded to him "because he didn't want to go to jail."

47.     After Relator began working at Home Towne Rx, ownership interest was transferred to Defendant Nidha Ahmed, likely resulting from Defendant Sheikh's incarceration. Relator was initially told that Defendant Sheikh was returning to Pakistan for a year and his daughter would be running Home Towne Rx.    However, Relator has personal knowledge that Sheikh still controls and directs the fraudulent schemes and operations at Home Towne Rx

through direct communication with Ahmed and other employees and members of his extended family who also work there. Relator also learned through a online search, that Defendant Sheikh had actually been jailed for credit card fraud starting in December, 2019. During his employment, Relator observed Defendants' systematic scheme of defrauding the Government. Relator's observations caused him to grow increasingly concerned about the negative impact the fraud would have on his career, the health of Home Towne Rx's customers, and the wellbeing of his family.

48.     Defendants' scheme is comprised of two types of billing methods. The first fraud is a quick and straightforward theft from the Government. It involves billing for the distribution of prescription drugs that were never prescribed by doctors, requested by customers, or dispensed to customers. The second fraud is equally simple, but carries with it a dangerous potential of widespread public health consequences. It involves improperly repurchasing, repackaging, and relabeling prescription drugs for the treatment of HIV/AIDS for distribution to new customers.

### Micromerchant Billing Software

49.     Defendants employ a billing software platform known as Micromerchant for the processing of claims submitted from Home Towne Rx and Sheikh's other related pharmacies.

50.     Micromerchant is a software platform designed to aggregate and store all information relevant to the pharmacy's inventory of prescription medications, customers' prescriptions, and the filling of individual customers' prescriptions that the pharmacist inputs. That information is translated into claims for reimbursement from Government Programs for the distribution of prescription medications which are sent to Micromerchant for processing.

51.    After Micromerchant receives the claims from the pharmacy, it forwards them to a third-party company that reviews all claims for eligibility—ensuring that the information is properly input into the claim before approving it for submission to Medicare, Medicaid or other equivalent private insurers for reimbursement.

52.    Once the claims are approved by the third-party company, they are submitted to Medicare, Medicaid or the private insurance carriers for processing and reimbursement.   The false claims at the heart of Relator's *qui tam* Complaint were all submitted to either Medicare or Medicaid for payment.

53.    The claims forwarded to Micromerchant have the customer's signature attached. When customers physically visit Home Towne Rx to claim their prescriptions, they sign an electronic signature pad which is connected to the claim.  For prescriptions that are delivered to customers outside of Home Towne Rx, there is a paper signature form that has printed on it a scannable code which is subsequently entered into the Micromerchant software platform at Home Towne Rx or whichever Sheikh-owned pharmacy is doing the billing.

54.    To access Micromerchant, the user (typically a licensed pharmacist) logs into the software platform using a unique username and password.  Any person who knows the licensed pharmacist's login information can log in as that licensed pharmacist and make changes at will. However, where multiple individuals are logged into Micromerchant using the same username and password, they can observe the other users as they make changes on the software platform.

**Billing for Prescriptions Never Dispensed**

55.    The first fraud is a theft of Government funds from Medicare and Medicaid by inputting prescriptions into Micromerchant that were never prescribed by doctors, requested by patients or picked up by patients.  Erica Pagan explained to Relator that Defendant Ahmed

routinely billed for refilling prescriptions when no refill was ever requested by the customer or their physician by logging into Micromerchant using the pharmacists' login information. Thus, no drugs are ever dispensed, but the Government Funds are billed as if the prescriptions were filled and dispensed.

56. The most common method Defendants use to bill for these medications that were never prescribed by doctors, requested by customers, or picked up by customers is to forge customer signatures on the scannable paper signature forms used for delivery. This avoids any detection or sanction during an audit. Pharmacies risk sanctions for billing for prescriptions that were never dispensed. However, since those forged signatures create confirmation that those false prescriptions and refills have been picked up, Defendants avoid detection and punishment. Relator learned from Charles Miller, the delivery driver for Home Towne Rx, that a previous pharmacist, Wendy Stroble, frequently engaged in this manner of fraudulent billing.

57. Prior to working at Home Towne Rx, Wendy Stroble had surrendered her Pharmacist's License due to her alleged theft of controlled dangerous substances and a criminal investigation by the Willingboro Township Police Department. In addition, now that Relator has been terminated, Ahmed has rehired Wendy Stroble as the head licensed pharmacist at Home Towne Rx to conduct and continue the fraudulent billing. Defendants are able to continue this scheme due to the sheer volume of claims that Government Programs receive. The claims are so numerous that Government Programs are incapable of looking at each claim to determine its veracity.

58. Defendant Ahmed has previously requested that Relator provide her with his Micromerchant login information so that she could access the software platform remotely. On

15

multiple instances where Relator observed Ahmed access his Micromerchant remotely, he saw her fill prescriptions for persons whom Relator knew had died.

59.    In one instance, Relator had already filled prescriptions for customers totaling between $2800 and $2900.  Ahmed accessed Micromerchant on the billing computer remotely and created and submitted claims for medications that had not been prescribed or dispensed. After Ahmed finished with her remote access, she had increased the prescription sales by $5000. Relator recorded the computer screen while Ahmed entered the false prescriptions.

60.    Indeed, Relator observed Ahmed on numerous occasions log into Micromerchant remotely to bill fraudulently.  The following is a chart listing Relator's observations of Ahmed's remote access and fraudulent billing:

| Date/Time of Access | Fraudulent Activity |
|---|---|
| August 14, 2019 1:37 pm | Erica Pagan informs Relator that Ahmed sent her a text message requesting that she allow Ahmed access to Micromerchant to bill remotely for prescriptions. |
| August 14, 2019 2:12 pm | Erica Pagan speaks with Ms. Lilly, a pharmacist working at another of Sheikh's pharmacies.  Ms. Lilly asks Erica Pagan if Relator is comfortable with Ahmed's fraudulent remote billing.  Erica Pagan responds to Ms. Lilly that Relator is not comfortable with Ahmed's fraudulent billing, to which Ms. Lilly states that she is glad that she is not the only one uncomfortable with Defendants fraudulent schemes. |
| August 14, 2019 2:25 pm | Erica Pagan informs Relator that Ahmed had already billed $1000 in fraudulent claims that day. |
| August 14, 2019 3:05 pm | Erica Pagan shows Relator on her computer at Home Towne Rx how sales for dispensing prescription medications had risen from $2000 to $4000 in the hour that Ahmed had been remotely billing on Micromerchant. |
| August 14, 2019 3:12 pm | Relator observes on the computer at Home Towne Rx that Ahmed had billed for the filling |

| | and dispensing of approximately eighty prescriptions when only twenty-five to thirty had actually been dispensed. |
|---|---|
| August 30, 2019 11:28 am | Erica Pagan explains to Relator that Ahmed had been finalizing false and fraudulent claims on Micromerchant using Relator's initials. |
| August 30, 2019 11:34 am | Erica took a screenshot on the computer at Home Towne Rx documenting Ahmed using Relator's initials to create false and fraudulent bills on Micromerchant remotely. |
| August 30, 2019 12:00 pm | Relator notices a significant increase in purported sales and dispensing of prescription medication after Ahmed finishes using Micromerchant remotely. |
| September 7, 2019 10:26 am | Relator observes numerous prescription medications in storage at Home Towne Rx that had been billed for but never actually dispensed to customers. |
| September 21, 2019 1:36 pm | Relator receives a telephone call at Home Towne Rx from a customer requesting to have her prescription medication packaged and ready for pickup for the first time. Ahmed had already billed twice for dispensing the medication to that customer. |

61.     Ahmed had even requested that another computer be set up with Micromerchant access in the back office of Home Towne Rx to continue making additional fraudulent claim because she feared that Relator would resign. However, Ahmed was stopped by Erica Pagan who explained to her that Ahmed would not be able to make changes to Micromerchant if there was no pharmacist working at Home Towne Rx. So while there was a computer in the backroom of the pharmacy, it was not used to fulfill prescriptions.

62.     Relator explained to Erica Pagan his objections to Ahmed using his login credentials to access Micromerchant for remote billing. He then brought those same objections to Ahmed about her logging into Micromerchant using his login information and inputting

fraudulent claims because she is not a licensed pharmacist, and the patient was dead, but his objections were ignored.

63.    Relator suggested that Home Towne Rx try other methods of increasing profits such as adding a section for Spanish-speaking customers, starting an immunization clinic, and handing out brochures and pamphlets to customers while they shopped at the Food Bazaar in which Home Towne Rx is located. While Ahmed considered Relator's proposals, she refused to end the practice of fraudulent billing for prescriptions that were never dispensed.

64.    Eventually, Relator brought his same objections to Sheikh. He complained to Sheikh about Ahmed's fraudulent billing, but was given the preposterous explanation that Home Towne Rx previously employed a pharmacist who Sheikh described as "crazy" and who had deleted many refilled prescriptions. Sheikh told Relator that he and Ahmed were simply adjusting the billing through Micromerchant in an attempt to recover the reimbursement they lost from those deletions that occurred prior to Relator's employment.

65.    That explanation was directly rebutted by Erica Pagan, who informed Relator that the previous pharmacist, Ms. Lilly [last name not known] never deleted any records at Home Towne Rx, and in fact had resigned because of her objections to Defendants' fraudulent billing scheme.

66.    Moreover, on May 4, 2020, Relator received email correspondence from Anthony Rubinaccio, the Executive Director of the New Jersey Board of Pharmacy, indicating that the pharmacy permit attached to Home Towne Rx's 635 South Clinton Avenue address had actually been transferred on July 2, 2017, the date of Defendant Sheikh's acquisition, and the New Jersey Board of Pharmacy did not know that pharmacy operations continued to be conducted at that location for the past three (3) years.

67.    Accordingly, Home Towne Rx had been billing for prescriptions filled at a location which should not have been operating at all.  In fact, On March 5, 2020, Relator was instructed to forward the prescriptions to Raab Pharmacy in Passaic for submission to Government Programs.  Relator concluded that, Defendants were playing a shell game, wherein they transferred pharmacy licenses to locations other than those housing operating pharmacies in order to avoid random audits performed by the New Jersey Board of Pharmacy, and falsely billing the Government by submitting bills for pills in Passaic that were actually filled in Trenton.

68.    As such, Home Towne Rx had been providing prescription medication and pharmacy services without the proper permit for the entire time that Relator was employed, which makes all of the prescriptions false.[1]

### Diversion of Prescription Medication

69.    The second component of Defendants' Fraud involves the diversion of prescription medication for HIV/AIDS.  In the United States, drug manufacturers deliver prescription medications to end users (such as pharmacies, doctors, hospitals, and clinics) either directly or through wholesale prescription medication suppliers.  Specifically, drugs are often supplied by the drug manufacturer to a wholesaler, typically one of the "Big-Three" wholesalers (McKesson, Cardinal, and Amerisource Bergen) or to smaller "secondary wholesalers," and ultimately to the end user, such as retail pharmacies, hospitals or clinics.

70.    In the prescription medication wholesale market, there is often one wholesaler that delivers a particular medication from the manufacturer to the end user.  In other cases, the initial wholesaler sells the medication to another wholesaler, who may in turn sell them to

---

[1] Pursuant to N.J.S.A. 45:14-75(a), "no pharmacy practice site shall operate until it has been issued a permit by the board."  With its pharmacy permit transferred to another location, Home Town Rx should not have been and should not be engaging in the practice of pharmacy operations.

another, and so on.  Although elements of the secondary market are entirely legitimate, aspects of this system allow criminal diverters or pharmacies, whether an entity or an individual, to acquire "diverted" drugs re-routed from their intended channels of distribution.

71.    Without strict adherence to the rules and regulations governing the handling of prescription medications by wholesale distributors, such as clean facilities, proper storage conditions, precise packaging/labeling, and quarantine areas for the storage of prescription medications that are outdated or damaged, the public may be exposed to dangers to their health if they ingest these diverted medications.[2]

72.    Drug diverters financially benefit from trafficking in diverted prescription medications when diverted medications are sold to secondary wholesalers or end users. Typically, individuals purchase prescription medications without proper documentation, outside proper and normal distribution channels, for less than the medication's market value, and then resell the diverted drugs to customers, as if the medications had been legitimately obtained. Once the drugs are dispensed to the customer, insurers, including the Government Programs, pay for the same medications twice or more.  Complicit pharmacies bill the Government Programs for the diverted medications and in reliance on the representations made by the pharmacy, the Government Programs reimburse the pharmacy for the medication at full price.  Unfortunately, the public unknowingly receives diverted medication that may have been adulterated, stored, transported, and/or labeled improperly.

### Defendants are Improperly Diverting Prescription HIV/AIDS Medication

73.    This exact type of prescription medication diversion is the second half of Defendants' scheme.   Home Towne Rx has numerous customers who receive HIV/AIDS

---

[2] A prescription medication is considered "adulterated" if, among other things, it is held under unsanitary conditions or if it is packed or held in conditions that do not conform to good manufacturing practices.  (*See* 21 U.S.C. § 351).

medication. The profit margin on prescription HIV/AIDS medication lawfully obtained from licensed wholesale distributors and dispensed to Government Program participants is modest. Those drugs, when properly sourced through a wholesaler for packing and distribution to individual customers, cost approximately $3500 per prescription bottle amount. The reimbursement obtained from the Government only slightly outpaces what the pharmacy spends on stocking those medications from wholesalers.

74.    Defendants traffic in diverted drugs and receive their stock of diverted HIV/AIDS medication from customers who have filled their prescriptions previously. Instead of purchasing new HIV/AIDS medications from wholesalers to be freshly packed for customers, Defendants review their list of customers who need upcoming HIV/AIDS medication, and then find prior recipients of the HIV/AIDS drugs, and purchase the customers' unused medication, which is often the entire bottle of medication. These customers are frequently lower-income individuals suffering from drug dependency issues. Defendants are taking advantage of a notably vulnerable demographic to achieve their scheme, sometimes by buying the HIV/AIDS drugs on the streets for as little as $50 per bottle.

75.    Defendants purchase those unused drugs frequently for less than $100 or $50 to be repackaged and resold at a significant profit, since the Government Programs are billed $3500 per bottle.

76.    Rather than paying the full price for new drugs from a wholesaler, Defendants are billing again for the same drugs that the Government had already paid for, as well as making a huge markup on the second and subsequent prescriptions.

77.    Relator has personal knowledge that Erica Pagan, on the orders of Sheikh and Ahmed, provided a list of customers who had picked up HIV/AIDS medication to Defendant

Mansour.  Mansour visits the customers who picked up those drugs and purchases whatever remained of their prescriptions.

78.     After purchasing the used HIV/AIDS medication, Mansour returns to the pharmacy to deliver the previously issued prescriptions, sometimes in a Dunkin' Donuts or brown paper bag.  The original labels on those prescription bottles have been torn off  and Relator was instructed to replace them with new labels.  The HIV/AIDS medications diverted were then unlawfully placed into whichever bottles needed additional medications to fill the individual customers' prescriptions which is illegal as HIV/AIDS medication must be dispensed only in its original bottle from the wholesaler by law, and the mixing of potentially adulterated medications with different expiration dates with new medications is strictly prohibited.  Relator has personally observed that many prescription bottles that were filled with the reclaimed HIV/AIDS medications were still sticky from the previous label having been torn off.

79.     Relator learned more specific information related to the fraud by speaking with Home Towne Rx's driver Charles Miller.  On February 20, 2020, Charles Miller explained to Relator that Sheikh had ordered him to offer customers of Home Towne Rx suffering from HIV or AIDS $50 to come to Home Towne Rx where they would be asked if they were willing to sell their prescriptions back for a significantly reduced price than what those same medications would cost if purchased from a proper wholesaler.

80.     Relator had told Mansour that he needed invoices along with the HIV/AIDS medications that Mansour brought to Home Towne Rx, but Mansour told him not to worry about it because the medications simply came from Sheikh's other pharmacies, including those in New York.  Despite repeated requests for transfer documentation from Sheikh's other pharmacies, Defendants never provided Relator with anything corroborating Mansour's explanation.

81.     Eventually, Mansour was replaced by Defendant Mushtaq as the individual tasked with diverting the prescription HIV/AIDS medication from customers to be repackaged, dispensed to new pharmacy customers, and billed to the Government Programs.  Similar to Mansour, Mushtaq would visit those customers who were included in the list provided by Erica Pagan to repurchase the medication.  He would then bring those medications back to Home Towne Rx, frequently in a paper bag, to be redistributed to customers.  Relator also never saw either invoices or transfer documentation indicating that the prescriptions delivered by Mushtaq came from a proper source or any of Sheikh's other pharmacies as Relator was told.

82.     On February 15, 2020, Relator received the first delivery of diverted prescription HIV/AIDS medication from Defendant Mushtaq.  Mushtaq was carrying the medication in a used Dunkin' Donuts bag.  Mushtaq did not provide Relator with any invoices documenting the drugs' origin despite Relator's repeated requests.

83.     Again, on February 18, 2020, Mushtaq brought prescription HIV/AIDS medication to Relator at Home Towne Rx that had been diverted from previous customers. Relator was able to make a video recording of the condition of the bottles in which the diverted HIV/AIDS medications were stored, showing that they were still sticky from where the previous label had been removed.

84.     Mushtaq then made two separate deliveries of diverted, prescription HIV/AIDS medication on March 10, 2020 and March 18, 2020 respectively.  On March 10, 2020 in particular, Mushtaq delivered three separate prescription HIV/AIDS medications—Stribid, Tivicay, and Complera—all of which were in bottles still sticky from having their labels removed.

85.     Defendants eventually halted their HIV/AIDS medication swapping scheme in January 2020 when Home Towne Rx received notice that Horizon Medical was going to audit their Micromerchant records on February 5, 2020.   Relator personally observed Defendants dispose of the reclaimed HIV/AIDS medications and replace them with drugs purchased from a wholesaler in a panic because of the impending Horizon Medical audit.   Then Defendants covered for the copious drugs that had been billed for but never dispensed by forging customer signatures on the scannable paper confirmation forms.   However, Relator believes that Defendants have restarted the swapping scheme once that the audit has been completed.

### Improper Salary Payment

86.     Defendants have perpetuated their fraudulent scheme by carefully employing less experienced pharmacists who are less likely to understand the depth and impact of the fraud.

87.     Moreover, the pharmacists and pharmaceutical technicians receive payment not from Home Towne Rx but in the form of personal checks from Sheikh or Ahmed.   Prior to Relator, the other prior pharmacists were paid in cash under the table.

88.     On April 10, 2020, Defendant Khan pressured Relator to accept payment in the form of cash.   He explained to Relator that by paying  him in cash, Defendants would save money.   Khan expressed to Relator that Ahmed was looking to sell the pharmacy, but that if Relator were willing to take a reduction in pay to be dispensed in cash he might avoid that sale,.   Despite these pressure tactics, Relator refused to be paid in cash.

89.     However, the last several paychecks that Relator received were handwritten and did not include a paystub.   Instead, Defendants represented to Relator that the handwritten check already had the appropriate quantity of taxes withheld from it.

90.    Relator, concerned about these fraudulent activities, called the NJ Fraud Hotline on August 30, 2019  and reported the various frauds to the Government.  Relator has continued to cooperate with their ongoing investigation that he initiated, and now brings this complaint to fully expose the Defendants' fraudulent schemes.

### Retaliation

91.    On numerous occasions, Relator attempted to convince Defendants to stop engaging in fraudulent activities; they refused.  Relator even suggested to Sheikh and Ahmed that he could make the pharmacy more profitable by giving immunizations to patients, pursuant to his license, and suggested the pharmacy include a separate section for certain products requested by their customers.  Defendants never accepted or supported any of Relator's suggestions.

92.    Instead, Defendants took adverse, retaliatory actions against Relator for complaining about their unlawful practices.

93.    Notably, Relator never received any criticisms or workplace citations for the performance of his duties as head pharmacist at Home Towne Rx.  To the contrary, Defendant Khan consistently informed Relator that he was well-liked and respected by Home Towne Rx's customers.  However, the circumstances of Relator's termination demonstrate that the end of his employment was retaliatory in nature, punishing him for raising objections to Defendants fraudulent scheme, and functioning as an artifice for the eventual rehiring of Wendy Stroble as head pharmacist.

94.    First, Relator complained about Mansour's diversion of prescription HIV/AIDS medication.  As Mansour brought more and more of these medications which had been repurchased from customers for whom those prescriptions were filled, or purchased on the street,

Relator stressed that prescription HIV/AIDS medication needed to include invoices. Relator's complaints were waved aside, and Relator received the dubious explanation that the drugs were being swapped between, or were acquired from, Sheikh's other various pharmacies. When he requested that Defendants provide him with documents memorializing the transfer of those HIV/AIDS medications from Defendants' other locations, he received nothing.

95.    When Mushtaq took Mansour's place directing the diversion of prescription HIV/AIDS medications, Relator requested that Charles Miller take a photograph of the lot number, expiration date, and the physical condition of the bottles that the diverted HIV/AIDS medications were being stored in and send the photograph to him, as Relator's phone had no battery charge left. Miller mistakenly sent the photograph to a text message group conversation including both Relator and Mansour, alerting Defendants to Relator's attempts to document the illegal diversion scheme occurring at Home Towne Rx.

96.    Relators' complaints to Sheikh about Ahmed's persistent and systematic billing for prescriptions that had never been dispensed to customers were similarly swept aside. Relator repeatedly raised objections to Ahmed, whom Relator was told is a college student in Florida, for logging into his Micromerchant account to make changes and created fraudulent claims. Again, Relator was given the preposterous explanation that this pattern of illegal activity was put in place to make up for profits lost due to a vaguely-identified previous pharmacist.

97.    Ahmed asked Relator why he was not automatically refilling certain medications, and Relator responded that he was unable to complete those refills since Home Towne Rx did not have an agreement with a wholesaler. Without the drugs delivered from the wholesaler, he simply could not complete those refills. Ahmed said that she would get Relator all the medications he needed but never did so.

98.    Moreover, due to Defendants history of fraudulent billing, all but a few private insurers and the Government Programs were no longer reimbursing claims from Home Towne Rx.  Accordingly, Defendants ordered Relator to fill the prescriptions at Home Towne Rx, but transfer them to Defendant Raab  Pharmacy Passaic for billing.  Relator raised numerous concerns about this billing practice.  He noted that by sending claims up to Passaic for billing, he was significantly delayed in collecting copays from customers.  More importantly, Relator complained in a text message to Ahmed and Khan on or about March 26, 2020 that he was troubled by the "legal ramifications" of representing to the private insurers that prescriptions billed from Passaic had actually been filled at Home Towne Rx.

99.    Relator also consistently refused to be paid in cash despite frequent pressuring from Khan that he accept it as a way to help save money for Defendants.

100.    Despite his hard work and conscientious adherence to billing standards, Relator was terminated.  On April 29, 2020, Relator received a telephone call from Khan wherein Khan explained to Relator that his final day would be May 1, 2020 as Home Towne Rx had been sold. However, when Relator probed further, Khan changed the explanation, and replied that Ahmed was simply looking to sell Home Towne Rx.  Relator then texted Ahmed and asked why he was being let go.  Ahmed replied that she had sold the pharmacy and the new owner would be using its own pharmacist.

101.    On May 1, 2020, Khan came to Home Towne Rx to collect Relator's key to the pharmacy and give him his last check.  This check was handwritten with the tax withholdings purportedly already deducted.  Khan told Relator that he would provide Relator with a pay stub but never did so.  Khan also said to Relator that while Ahmed wanted to close the pharmacy,

Relator might be able to keep his job if he agreed to reduce his pay from $50 per hour to $30 per hour and agree to be paid in cash.

102.    In reality, Home Towne Rx was never sold or closed.    Instead Defendants replaced Relator with Wendy Stroble.    Defendants terminated Relator for his consistent refusal to take part in or aid in the commission of their fraudulent schemes.    Rather than risk Relator alerting the proper authorities of the illegality, Defendants returned to a previous pharmacist who they knew would be a willing confederate in their fraud.

### THE GOVERNMENT HAS BEEN DAMAGED
### AS A RESULT OF DEFENDANTS' CONDUCT

103.    As a direct and intended result of their fraud, Defendants have submitted, and caused to be submitted, thousands of false claims for prescription drug reimbursement from Medicare and Medicaid, including the Covered period in this Complaint and within the applicable statutes of limitations.

104.    As alleged previously herein, Defendants routinely billed for prescriptions that had not been filled, or had not been ordered, based on false documentation.

105.    As further alleged previously herein, Defendants routinely billed for prescription HIV/AIDS medication that had been improperly diverted or purchased on the street and re-dispensed to customers of Home Towne Rx.

106.    Relator estimates that Defendants billed for at least 10-15 improperly diverted bottles of HIV/AIDS medication each month.    Relator also observed that, on the days that Ahmed accessed the billing system, she would falsely and fraudulent bill for numerous prescriptions that were never dispensed.

107.    Based on these numbers, Relator estimates that Defendants' unlawful scheme has caused the United States Government and the State of New Jersey to be defrauded out of millions in taxpayer funds.

## COUNT I
## SCHEME TO SUBMIT FRAUDULENT CLAIMS
### (31 U.S.C. § 3729(a)(1)(A))

108.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 107 of this Complain as if fully set forth herein.

109.    By virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

110.    Defendants submitted bills to Government Programs for payment and retained improperly obtained payments arising from their billing for prescription medications that were never dispensed and for prescriptions filled by repackaging and relabeling prescription HIV/AIDS medication that had been improperly diverted.  All such false claims were knowingly submitted to get false or fraudulent claims paid or approved by the Government.

111.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties of at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT II
## SUBMISSION OF CLAIMS CONTAINING
## FALSE EXPRESS OR IMPLIED CERTIFICATIONS
### (31 U.S.C. § 3729(a)(1)(A))

112.    Relator repeats and incorporates by reference the allegations contained in Paragraph 1 through 111 of this Complaint as if fully set forth herein.

113.    By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records or statements—*i.e.*, the false certifications and representations made or caused to be made by Defendants—material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

114.    By submitting claims for payment and retaining improperly obtained payments Defendants expressly and impliedly, if falsely, certified to their compliance with the relevant Government and CMS regulations authorizing such payments.

115.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties of at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT III**
**FALSE RECORDS FOR PAYMENT**
**(31 U.S.C. § 3729(a)(1)(B))**

116.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

117.    Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for the provision of prescription medications that were never dispensed and for prescriptions filled by repackaging and relabeling prescription HIV/AIDS medication that had been improperly diverted.  All such false claims were knowingly submitted to get false or fraudulent claims paid or approved by the Government.

118.    Defendants thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

119.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties of at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT IV
### FALSE CLAIMS CONSPIRACY
### (31 U.S.C. § 3729(a)(1)(C))

120.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 119 of this Complaint as if fully set forth herein.

121.    Defendants entered into a conspiracy or conspiracies through their multiple pharmacies, businesses, employees, and others to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for the provision of prescription medications that were never dispensed and for prescriptions filled by repackaging and relabeling prescription HIV/AIDS medication that had been improperly diverted.

122.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties of at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT V
### REVERSE FALSE CLAIMS
### (31 U.S.C. § 3729(a)(1)(G))

123.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 122 of this Complaint as if fully set forth herein.

31

124.   By virtue of the acts alleged herein, the Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay, transmit, or return money to the Government.

125.   As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties of at least $11,181 and up to $22,363 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT VI
## FALSE CLAIMS ACT: RETALIATION
## (31 U.S.C. § 3730(h))

126.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants retaliated against Relator for his reporting of and efforts to prevent the unlawful acts described herein.

128.   As a result Relator suffered damages in the form of emotional distress and economic loss from retaliation for his internal reporting and lost pay following his termination.

## COUNT VII
## NEW JERSEY FALSE CLAIMS ACT
## (N.J.S.A. §§ 2A:32C-1 *et seq.*)

129.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 128 of this Complain as if fully set forth herein.

130.   As a result of the conduct described in these allegations, Defendants have violation sections (a), (b), (c), and (g) of N.J.S.A. § 2A:32C-3, defining liability under the NJFCA.

32

131.    During the Covered Period, Defendants have (1) knowingly presented or caused to be presented to the Government a false or fraudulent claim for payment or approval, as contemplated by 2A:32C-3(a); (2) knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government, as contemplated b 2A:32C-3(b); (3) conspired to defraud the Government by getting a false or fraudulent claim allowed or paid by the Government, as contemplated by 2A:32C-3(c); and (4) knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state, as contemplated by 2A:32C-3(g).

132.    Specifically, Defendants submitted or caused to be submitted invoices and other statements containing false and fraudulent claims for payment and approval by Government Programs knowing the claims were not entitled to such payment or approval, and retained improperly payments that they knew were required to be refunded to the Government Programs. Beginning in at least 2017 and continuing to the present, every invoice submitted by Defendants, their agents, or contractors or subcontractors constitutes a false claim under the above provisions of the NJFCA.

133.    As a result of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the State of New Jersey entitled to at least $11,181 and up to $22,363 for each false or fraudulent claim, plus three times the amount of damages which the State sustains arising from Defendants' unlawful conduct as described herein.

## COUNT VIII
## NEW JERSEY MEDICAL ASSISTANCE and HEALTH SERVICES ACT
## (N.J.S.A. § 30-4D-1 *et seq.*)

134.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 133 of this Complaint as if fully set forth herein.

135.    The New Jersey Medical Assistance and Health Services Act ("NJMAHS") N.J.S.A. § 30:4D-1, *et seq.*, is aimed at providing medical assistance to residents with limited resources, but also provides false claims act like protections in the event of a violation.

136.    The NJMAHS makes it a crime of the third degree with a presumption of imprisonment for any person to willfully obtain benefits from the New Jersey State Medicaid Government Program to which he or she is no entitled or in a greater amount than that to which the person is entitled, as well as for any provider who willfully receives medical assistance payments to which the provider is not entitled or in a greater amount than that to which a provider is entitled. N.J.S.A. § 30:4D-17.

137.    It is also illegal under the NJMAHS for any provider, or any person, firm, partnership, or entity to: (1) knowingly and willfully make or cause to be made any false statement or representation of a material fact in any cost study, claim form, or any document necessary to apply for or receive any State Medicaid benefit or payment; (2) knowingly and willfully make or cause to be made any false statement, written or oral, of a material fact for use in determining rights to such benefit or payment; or (3) conceal or fail to disclose the occurrence of an event which (i) affects a person's initial or continued right to any such benefit or payment, or (ii) affects the initial or continued right to any such benefit or payment of any provider or any person, firm, partnership, corporation, or other entity on whose behalf of a person has applied for or is receiving such benefit or payment with an intent to fraudulently secure benefits or payments

34

not authorized or in a greater amount than that which is authorized under State Medicaid; or (4) knowingly and willfully convert benefits or payments or any part thereof received for the use and benefit of any provider or any person, firm, partnership, corporation, or other entity to a use other than the use and benefit of such provider or such person, firm, partnership, corporation, or entity. *Id.*

138.    In addition to any other penalties provided by law, violators of the NJMAHS shall be liable for civil penalties of:  (1) payment of interest on the amount of the excess benefits or payments at the maximum legal rate in effect on the date the payment was made; (2) payment of an amount not to exceed three-fold the amount of such excess benefits or payments; and (3) payment in the sum of not less than and not more than the civil penalty allowed under the federal False Claims Act, as it may be adjusted for inflation, for each claim for assistance, benefits or payment.

139.    In this matter, Defendants submitted bills to the Government for payment and retained improperly obtained payments arising from their billing for prescription medications that were never dispensed and for prescriptions filled by repackaging and relabeling prescription HIV/AIDS medication that had been improperly diverted.

140.    As a result of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the State of New Jersey entitled to at least $11,181 and up to $22,363 for each false or fraudulent claim, plus three times the amount of damages which the State sustains arising from Defendants' unlawful conduct as described herein.

## COUNT IX
## COMMON LAW FRAUD

141.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 140 of this Complaint as if fully set forth herein.

142.    Defendants misrepresented the existence or nature of their provided pharmacy services with the intent that Government Programs rely on those material misrepresentations in order to obtain payment to which they knew they were not entitled.

143.    Government Programs issue payments based on voluntary submissions by service providers; the Government Programs' reliance on the representations in such submissions is not only justifiable, therefore, but also necessary for their fundamental operation.

144.    As a result of Defendants' acts, the United States and the State of New Jersey have been damaged, and continue to be damaged, in an amount to be determined at trial.

## COUNT X
## COMMON LAW UNJUST ENRICHMENT

145.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 144 of this Complaint as if fully set forth herein.

146.    Defendants have been unjustly enriched by collecting and keeping compensation in cash and kind that they knew to be prohibited under the FCA, NJFCA, and professional guidance, and which would not have been paid to Defendants but for their illegal submissions of false claims to Government Programs.

147.    Defendants were not entitled to any payment for these illegal services. The Government is entitled to, and equity and good conscience demand, the return of such payments to the public fisc.

## COUNT XI
## COMMON LAW CONVERSION

148.    Relator repeats and incorporates by reference all of the allegations contained in Paragraphs 1 through 147 of this Complaint as if fully set forth herein.

149.    Defendants received substantial amounts of monies from the Government as reimbursement for the false and fraudulent claims that they submitted to Government Programs that they knew to be prohibited under the FCA, NJFCA, and professional guidance.

150.    Defendants' actions, represent an exercise of rights of ownership over monies rightfully belonging to the United States and the State of New Jersey.

151.    Defendants have wrongfully converted the United States' and the State of New Jersey's monies to their own use and purpose to the exclusion of the United States' and the State of New Jersey's ownership rights.

152.    As a result of Defendants' acts, the United States and the State of New Jersey have been damaged, and continue to be damaged, in an amount to be determined at trial.

## COUNT XII
## WHISTLEBLOWER RETALIATION IN VIOLATION OF THE NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA")
## (N.J.S.A. § 34:19-1, *et seq.*)

153.    Relator repeats and incorporates by reference all of the foregoing allegations contained in Paragraphs 1 through 152 of this Complaint as if fully set forth herein.

154.    Defendants violated CEPA, N.J.S.A. § 34:19-1, et seq., by discharging Relator in retaliation for Relator's objections to and refusal to participate in conduct by Defendants that Relator reasonably believed was unlawful and/or fraudulent and/or criminal.

155.    Defendants also violated CEPA by dismissing Relator because Relator was documenting Defendants' fraudulent conduct.  Defendants intended their firing of Relator to

prevent Relator from providing evidence of their fraudulent conduct to appropriate governmental authorities.

156.    As a result of Defendants' unlawful conduct, Relator has suffered and continues to suffer economic losses, emotional distress, harm to career, harm to reputation, and other such damages compensable under CEPA.

## **PRAYER FOR RELIEF**

WHEREFORE, on each of these claims, Relator requests the following relief be ordered:

A.  Defendants cease and desist from further violations of the FCA, NJFCA and NJMAHS;

B.  Defendants pay three times the damages incurred by the United States and the State of New Jersey pursuant to the FCA, NJFCA and NJMAHS;

C.  Defendants pay a civil penalty to the United States and the State of New Jersey of $22,363 for each false or fraudulent claim, pursuant to the FCA, NJFCA and NJMAHS;

D.  Defendants be excluded from future participation in Government Programs per NJMAHS;

E.  Defendants pay reasonable attorneys' fees, costs and expenses to Relator (with contingent-fee enhancement as to Relator's state law claims), the United States Department of Justice, and the New Jersey Attorney General's Office pursuant to the FCA, NJFCA, and CEPA.

F.  Relator be awarded the maximum amount allowed pursuant to the qui tam provisions of the FCA and NJFCA;

G.  Defendants pay pre- and post-judgment interest on the awards ordered herein;

H.  Defendants pay Relator compensatory, consequential, and punitive damages under CEPA; and

I.   Such further relief as the Court deems appropriate and just.

### DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury as to all issues so triable.


Dated: May 18, 2020

Respectfully submitted,

By: _____

Robert A. Magnanini
Michael A. Clore
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel:    (973) 218-1111
Fax:    (973) 218-1106
rmagnanini@stonemagnalaw.com
mclore@stonemagnalaw.com

By: _____

Christopher P. Lenzo
LENZO & REIS, LLC
360 Mount Kemble Ave., Suite 1004
Morristown, NJ 07960
Tel:    (973) 845-9922
Fax:    (973) 845-9933
clenzo@newjerseyemploymentattorneys.com

*Attorneys for Plaintiff-Relator*